## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
## WESTERN DIVISION

**PHILLIP D. HUISINGA,**

      Plaintiff,

v.

**MICHAEL J. ASTRUE,**
Commissioner of Social
Security,

      Defendant.

**No. 10-CV-4118-DEO**

**ORDER**

_____

## I.  INTRODUCTION AND BACKGROUND

This matter is before the Court pursuant to Phillip D. Huisinga's, Plaintiff's, request for disability benefits under Title II of the Social Security Act (the "Act"), 42 U.S.C. §§ 401 et seq.

On July 30, 2007, Plaintiff filed for disability benefits claiming a disability onset date of February 1, 2004.  Tr. 121.  Plaintiff was last insured under the Act on September 30, 2004.  Therefore, Plaintiff must establish the existence of a disability, as that term is used in the Social Security Act, between his claimed onset date of disability, February 1, 2004, and his date last insured, September 30, 2004.  Tr. 126.  On December 2, 2009, an Administrative Law Judge (ALJ)

denied Plaintiff disability benefits; and, on September 27, 2010, the Appeals Council denied Plaintiff's request for review. On December 2, 2010, Plaintiff timely filed for review with this Court[1] pursuant to 42 U.S.C. § 405(g). Docket No. 1.

## II. FACTS

Plaintiff is 61 years old. Tr. 41. He was 53 in 2004 upon his date last insured. Tr. 41. He has an eighth grade education and limited work history of laying block, janitorial work, and performing odd jobs at a local trailer.[2] Tr. 42 and 127. Plaintiff claims a number of conditions affect his ability to work: hearing loss, bronchitis,[3] recurrent ear

---

[1] Though Plaintiff filed his complaint one day past the statute of limitations, on June 10, 2011, this Court ruled the statutory period was tolled and denied the Commissioner's motion to dismiss. Docket No. 13.

[2] The most he earned in a year was in 1989, in which he earned $9,862.02. From 2001 to 2003, he earned a total of $562; and from 2004 to 2009, he reported no income. Tr. 127.

[3] "Bronchitis is inflammation of the main air passages to the lungs. Bronchitis may be short-lived (acute) or chronic, meaning that it lasts a long time and often recurs." *Bronchitis*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth/PMH0002078/, last visited September 24, 2012.

infections, weak legs, emphysema,[4] and lower back pain.  Tr.
165.  At or around his date last insured, Plaintiff used:  an
Albuterol[5] Sulfate Machine and a Spiriva[6] inhaler for his lung
disease, eardrops for his ear infections, and Lipitor for high
cholesterol.  He was, throughout the record, intermittently
prescribed antibiotics for his chronic bronchitis and ear
infections.

## A.  Medical Records

Plaintiff began having severe problems with ear

---

[4] "Emphysema occurs when the air sacs in your lungs are
gradually destroyed, making you progressively more short of
breath.  Emphysema is one of several diseases known
collectively as chronic obstructive pulmonary disease (COPD)."
*Emphysema*, Mayo Clinic, available at http://www.mayoclinic.
com/health/emphysema/DS00296, last visited September 24, 2012.

[5] "Albuterol is used to prevent and treat wheezing,
difficulty breathing and chest tightness caused by lung
diseases such as asthma and chronic obstructive pulmonary
disease . . .  Albuterol is in a class of medications called
bronchodilators.  It works by relaxing and opening air
passages to the lungs to make breathing easier." *Albuterol
Inahalation*, Medline Plus, available at http://www.nlm.nih.
gov/medlineplus/druginfo/meds/a682145.html, last visited
September 24, 2012.

[6] Spiriva is a brand name of Tiotropium, which "is used
to prevent wheezing, shortness of breath, and difficulty
breathing in patients with chronic obstructive pulmonary
disease . . . ." *Tiotropium Oral Inhalation*, PubMed Health,
available at http://www.ncbi.nlm.nih.gov/pubmedhealth/
PMH0000262/, last visited September 24, 2012.

infections at age 13. Tr. 285. On June 29, 1965, when he was 14, Plaintiff underwent a right radical mastoidectomy.[7] Tr. 289. Thereafter, his infections flared repeatedly. The files show Plaintiff saw doctors for recurrent infections on October 6, 1987; May 3, 1990; July 23, 1990; December 11, 1990; May 12, 1992; August 17, 1993; April, 16, 1996; August 26, 1996; and October 13, 1998. Tr. 294-304.

On September 15, 2000, Dr. Thedinger, an ear specialist, indicated Plaintiff was complaining of dizziness and pressure behind his ears. Tr. 305. A hearing test indicated Plaintiff had difficulty hearing high frequency noises but had 76% language discrimination ability in his right ear and 100% language discrimination ability in his left ear. Tr. 222 and 226.

---

[7] "A mastoidectomy is performed to remove infected mastoid air cells resulting from ear infections, such as mastoiditis or chronic otitis, or by inflammatory disease of the middle ear (cholesteatoma). The mastoid air cells are open spaces containing air that are located throughout the mastoid bone, the prominent bone located behind the ear that projects from the temporal bone of the skull." *Mastoidectomy*, Encyclopedia of Surgery, available at http://www.surgeryencyclopedia.com/La-Pa/Mastoidectomy.html, last visited September 24, 2012.

On August 8, 2003, Dr. Thedinger indicated Plaintiff was complaining of dizziness, nausea, and vision changes when moving his head abruptly or coming in and out of doors. Tr. 225. A subsequent letter, dated September 19, 2003, from Dr. Thedinger to Disability Determination Services, indicates Plaintiff "has bilateral chronic otitis media[8] and hearing loss" with associated problems of chronic "dizziness which [was] positionally aggravated." Tr. 229. Dr. Thedinger recommended surgery, but Plaintiff was not "receptive." Id. Dr. Thedinger suggested Plaintiff "should not work above ground level or in a position where there is a great deal of head movement." Tr. 229. Dr. Thedinger also noted that Plaintiff had "significant problems related to hearing and communication." Tr. 229.

Dr. Creti, Plaintiff's primary care physician, dealt with Plaintiff's respiratory disease, cholesterol levels, and ear

_____

[8]"Otitis media is an infection of the middle ear, the area just behind the eardrum. It happens when the eustachian tubes, which connect the middle ear to the nose, become blocked with fluid. With the infection, mucus pus, and bacteria can also pool behind the eardrum, causing pressure and pain." Otitis media, University of Maryland Medical Center, available at http://www.umm.edu/altmed/articles/otitis-media-000121.htm, last visited September 24, 2012.

infections.  Notes from May 3, 2002, indicate Plaintiff was "unable to get a job due to disability but has been turned down by SSI."  Tr. 236.  The notes continue, "We'll try to have him appeal this and . . . get some help."  Tr. 236.  Dr. Creti further indicated Plaintiff was visiting the office due to increased shortness of breath.  Tr. 236.

On August 19, 2002, Dr. Creti noted Plaintiff presented with "chest congestion, chronic cough, [and] chronic drainage from the right ear."  Tr. 236.  Notes from January 22, 2004, indicate Plaintiff's cholesterol and triglyceride counts were "quite high," but he was otherwise "getting along well."  Tr. 242.  On September 21, 2004, Dr. Creti noted Plaintiff came in due to a "cold and chest congestion" related to chronic bronchitis.  Tr. 243.  Dr. Creti also noted Plaintiff was having difficulty affording his medications.  Tr. 243.

As previously noted, Plaintiff must be found disabled between February 1, 2004, and September 30, 2004.  Other than his visit to Dr. Creti on September 21, 2004, there are no medical records during this time period on file.  Tr. 243.  The next time Plaintiff visited a doctor was in January of 2005.  Though the transcript provided to this Court upon

Plaintiff's appeal contains a number of medical records indicating Plaintiff's conditions, particularly his chronic pulmonary disease, grew increasingly worse in the subsequent years, these records, because they relate to Plaintiff's condition well after his date last insured, are not presented in detail. However, this Court has reviewed these records in their entirety and considered them to the extent they are relevant.

## B. Layperson Evidence

As previously noted, on July 30, 2007, Plaintiff filed for disability benefits. On August 1, 2007, Mr. Eissens from Disability Determination Services interviewed Plaintiff. Tr. 132-36. Plaintiff claimed to be totally deaf in his right ear with 60% hearing in his left. Tr. 135. Mr. Eissens noted that Plaintiff seemed to understand the majority of the questions asked during the interview. Id. Though Plaintiff appeared congested, he did not exhibit labored breathing. Id.

On August 6, 2007, Plaintiff filled out a personal pain/fatigue questionnaire. Tr. 146-50. Plaintiff indicated he had an aching pain in his legs, sharp pains in his lower back and hips, and pain on the left side of his lungs. Tr.

146.  According to Plaintiff, his pain prevented him from walking or lifting much and from going outside when the weather was hot or humid.  Tr. 147.  Overall, Plaintiff estimated he could walk for ½ a block or less and could not sit for more than 5 to 10 minutes before his lower back began to hurt.  Tr. 149.  In an attached letter, Plaintiff indicated he gets treatment when he can but does not have health insurance.  Tr. 151.

In a December 4, 2007, Adult Function Report, Plaintiff reported problems sleeping and laying down due to his bronchitis.  Tr. 182.  He also reported that his various conditions affected his ability to lift, squat, bend, stand, walk, sit, kneel, talk, hear, and climb stairs.  Tr. 186.  He summarized:

> I don't understand why people that are on disability get it when they are far off better than I am . . .  I need to live just as much as any one else, and I also need the help.  If you could only walk in my shoes once you would understand.

Tr. 189.

On August 10, 2007, Plaintiff's wife, Deborah Huisinga, filled out an Adult Third-party Function Report.  Tr. 137. She indicated Plaintiff watched TV, played computer games, and

did light housework, such as laundry and washing dishes. Tr. 137, 139, and 141. She also indicated that his bronchitis acts up when he is exposed to heat, humidity, or pollen; and he uses an inhaler and mist breathing machine when he can afford it. Tr. 145. She reported his leg pain affected his ability to lift, squat, bend, walk, sit, kneel, and climb stairs; and he can walk for ½ block or less before having to rest a couple of minutes. Id. She also reported that his ear infections affect his ability to hear, talk, and understand; and he gets dizzy when he walks in and out of buildings. Tr. 142 and 145. Finally, she admitted that Plaintiff should go to the doctor more, but, unfortunately, they could not afford it. Tr. 145.

On October 5, 2007, Dr. Weiss filled out a physical RFC assessment for Disability Determination Services. Tr. 257-62. Dr. Weiss determined Plaintiff could, as of his date last insured, occasionally lift 50 pounds, frequently lift 25 pounds, stand and or walk with normal breaks for about 6 hours in an 8-hour workday, sit for about 6 hours in an 8-hour workday, and push and or pull 50 pounds occasionally and 25 pounds frequently. Tr. 258. Dr. Weiss determined Plaintiff

could climb stairs, stoop, kneel, and crouch frequently but could only occasionally balance or crawl. Tr. 259. Dr. Weiss determined Plaintiff lacked manipulative, visual, or speaking limitations, but he did suffer from hearing limitations. <u>Id.</u> Dr. Weiss also determined Plaintiff could be exposed to unlimited extreme cold, wetness, vibration, and hazards, such as machinery and heights, but should avoid concentrated exposure to extreme heat, humidity, noise, fumes, odors, dusts, gases, and poor ventilation. Tr. 261.

In an interrogatory dated October 12, 2009, Plaintiff indicated he could walk up to 1 to 1 and ½ blocks, could stand for 10 to 15 minutes at a time, and could sit for up to ½ an hour at a time. Tr. 217. He also indicated he could stand 1 to 1 and ½ hours and could sit for 1 and ½ hours within an 8 hour workday. Tr. 217. He described his daily activities in the following manner:

> Up at 7:00 a.m., sit and have coffee, walk around kitchen to keep from stiffening up, take breath treatment, take hot bath, do a few dishes, lay on couch and watch TV. Take another hot bath, breathing treatment and lie down for nap. At 3:00 p.m., wake up wife who works nights, back on couch laying down, do not do any cooking, I just snack, TV and hot bath and breathing treatments. I cough a lot and legs hurt so

> don't get much sleep at night.  At 10:00
> p.m., to 11:00 p.m., go to bed but I'm up
> throughout the night.

Tr. 219.

On November 12, 2009, Plaintiff pled his case before an Administrative Law Judge (ALJ).  Tr. 34-63.  He claimed his ear infections lasted anywhere from 2 to 8 months and prevented him from working for extended periods of time.  Tr. 43.  He also reported a recurrent buzzing in his ears that would render him completely immobile for 3 days at a time and dizzy spells when he bent over or went in and out of buildings due to changes in pressure.  Tr. 50, and 51.

## III.  LAW AND ANALYSIS

In order for a plaintiff to qualify for disability benefits, they must demonstrate they have a disability as defined in the Social Security Act (the "Act") prior to their date last insured.  The Act defines a disability as an:

> inability to engage in any substantial
> gainful activity by reason of any medically
> determinable physical or mental impairment
> which can be expected to result in death or
> which has lasted or can be expected to last
> for a continuous period of not less than 12
> months . . . .

42 U.S.C. § 423(d)(1)(A).

## A.  The ALJ's Decision and the Plaintiff's Complaint

Under the authority of the Social Security Act, the Social Security Administration has established a five-step sequential evaluation process for determining whether an individual is disabled and entitled to benefits.  20 C.F.R. § 404.1520.  The five successive steps are:  (1) determination of whether Plaintiff is engaged in "substantial gainful activity," (2) determination of whether Plaintiff has a "severe medically determinable physical or medical impairment" that lasts for at least 12 months, (3) determination of whether Plaintiff's impairment or combination of impairments meets or medically equals the criteria of a listed impairment, (4) determination of whether Plaintiff's RFC indicates an incapacity to perform the requirements of his past relevant work, and (5) determination of whether, given Plaintiff's RFC, "age, education and work experience," Plaintiff can "make an adjustment to other work."  20 C.F.R. § 404.1520(4)(i-v).

At step one, if Plaintiff is engaged in "substantial gainful activity" within the claimed period of disability, there is no disability during that period.  20 C.F.R. § 404.1520(a)(4)(i).  The ALJ determined Plaintiff had not

12

engaged "in substantial gainful activity during the period from his alleged onset date . . . through his date last insured . . . ." Tr. 21.

At step 2, if the Plaintiff does not have a "severe medically determinable physical or mental impairment" that lasts at least 12 months, there is no disability. 20 C.F.R. § 404.1520(a)(4)(ii). The ALJ found Plaintiff "had the following severe impairments: bilateral hearing loss due to chronic otitis media with positional vertigo[9] and history of chronic obstructive pulmonary disease[10] . . . ." Tr. 21. Significantly, in making his findings, the ALJ noted:

> The [Plaintiff] has also alleged disability due to additional physical impairments

---

[9] "Vertigo is the feeling that you or your environment is moving or spinning . . . Vertigo can be caused by problems in the brain or the inner ear." John P. Cunha, DO, FACOEP, *Vertigo*, emedicine health, available at http://www.emedicine health.com/vertigo/article_em.htm, last visited September 24, 2012.

[10] "Chronic obstructive pulmonary disease (COPD) is one of the most common lung diseases. It makes it difficult to breathe. There are two main forms of COPD . . . [c]hronic bronchitis, which involves a long-term cough with mucus . . . [and] [e]mphysema, which involves destruction of the lungs over time. Most people with COPD have a combination of both conditions." *Chronic obstructive pulmonary disease*, PubMed Health, available at http://www.ncbi.nlm.nih.gov/pubmedhealth /PMH0001153/, last visited September 24, 2012.

> including leg weakness and numbness, back
> pain, and right eye blindness . . .
> However, the [Plaintiff] has not shown
> these conditions existed or were severe
> prior to September 30, 2004, the date last
> insured, as significant limitations caused
> by these alleged impairments are not
> supported on the record.

Tr. 23.

At step 3, if Plaintiff's impairments meet or medically equal the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, and last at least 12 months, Plaintiff is deemed disabled. 20 C.F.R. § 404.1520(e). The ALJ found Plaintiff did not meet the criteria of a listed impairment. Tr. 22.

Before proceeding to step 4 and 5, the ALJ must determine Plaintiff's Residual Functional Capacity. RFC is the "most" a person "can still do" despite their limitations. 20 C.F.R. § 404.1545(a)(1). The ALJ found Plaintiff had the ability "to perform medium and light work, as defined in 20 C.F.R. § 404.1567(b and c), with no restrictions in standing, sitting, or walking," as well as the ability to "occasionally crawl." Tr. 22. The ALJ also noted Plaintiff suffered from "positional dizziness" and "should not work above ground level, meaning no work on ladders or ropes, or in a position

requiring excessive head movement which could cause dizziness," as well as "chronic high frequency hearing loss." Id. Finally, the ALJ determined Plaintiff should "avoid noise, wetness, humidity, heat, fumes, odors, dust, and gases." Id.

At step 4, if, given Plaintiff's RFC, Plaintiff can still perform their past relevant work, there is no disability. 20 C.F.R. § 404.1520(a)(4)(iv). The ALJ found Plaintiff had "no past relevant work" as defined in the Act and, therefore, this step did not apply. Tr. 25.

At step 5, if, given Plaintiff's RFC, age, education, and work experience, Plaintiff can make an adjustment to other work, there is no disability. 20 C.F.R. §§ 404.1520(a)(4)(v). This step requires the ALJ to provide "evidence" that Plaintiff could perform "other work [that] exists in significant numbers in the national economy." 20 C.F.R. § 404.1560(c)(2). In other words, at step 5, the burden of proof shifts from Plaintiff to the Commissioner of the SSA. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984). At the administrative level, an ALJ generally calls a Vocational

Expert (VE) to aid in determining whether this burden can be met.

The ALJ found "there were jobs that existed in significant numbers in the national economy" that Plaintiff could perform. Tr. 26. In so finding, the ALJ relied on the testimony of a VE who testified that given Plaintiff's RFC, age and education Plaintiff could perform . . .

> 50-55% of the full range of work at the light and medium exertional levels including representative occupations such as janitor . . . linen room attendant . . . inserting machine operator . . . and housekeeping cleaner . . . .

Tr. 26.

In response to the ALJ's decision, Plaintiff's brief raises two general arguments: (1) the ALJ improperly credited the opinions of non-examining consultants over the opinions of treating physicians; and (2) the ALJ failed to properly consider lay opinions, including the Plaintiff's subjective allegations of pain.

**B. Standard of Review**

This Court's role in review of the ALJ's decision requires a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.

*See* 42 U.S.C. § 405(g); <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008). Substantial evidence is less than a preponderance but enough that a reasonable mind might find it adequate to support the conclusion in question. <u>Juszczyk v. Astrue</u>, 542 F.3d 626, 631 (8th Cir. 2008) (citing <u>Kirby v. Astrue</u>, 500 F.3d 705, 707 (8th Cir. 2007)). This Court must consider both evidence that supports and detracts from the ALJ's decision. <u>Karlix v. Barnhart</u>, 457 F.3d 742, 746 (8th Cir. 2006) (citing <u>Johnson v. Chater</u>, 87 F.3d 1015, 1017 (8th Cir. 1996)). In applying this standard, this Court will not reverse the ALJ, even if it would have reached a contrary decision, as long as substantial evidence supports the ALJ's decision. <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004). The ALJ's decision shall be reversed only if it is outside the reasonable "zone of choice." <u>Hacker v. Barnhart</u>, 459 F.3d 934, 936 (8th Cir. 2006) (citing <u>Culbertson v. Shalala</u>, 30 F.3d 934, 939 (8th Cir. 1994)).

This Court may also ascertain whether the ALJ's decision is based in legal error. <u>Lauer v. Apfel</u>, 245 F.3d 700, 702 (8th Cir. 2001). If the ALJ applies an improper legal standard, it is within this Court's discretion to reverse his

decision.  <u>Neal v. Barnhart</u>, 405 F.3d 685, 688 (8th Cir. 2005); 42 U.S.C. 405(g).

## C. Medical Evidence

In determining a plaintiff's RFC, an ALJ must often weigh conflicting medical opinions.  For purposes of weighing medical opinions, the regulations express a clear preference for the opinions of treating and examining sources as opposed to non-examining sources.  20 C.F.R. § 416.927(d).  However, this preference is not absolute; the regulations go on to discuss a number of factors to be considered when assessing the weight of medical opinions.  20 C.F.R. § 416.927(d)(2)-(6).  For instance, treating opinions should be viewed in light of the "[l]ength of the treating relationship and frequency of examination," as well as the "[n]ature and extent of the [treating] relationship," including the type of treatment provided and "the extent of examinations and testing . . . provided."  20 C.F.R. § 416.92(d)(2).  Furthermore, treating, examining, and non-examining source opinions should all be evaluated in terms of the relevant evidence used to support the opinion, the internal consistency of the opinion, the specialization of the source of the opinion, and other

18

factors a plaintiff or others bring to the attention of the Commissioner. § 416.927 (d)(3)-(6).

As previously noted, Plaintiff contends the ALJ improperly credited the opinions of non-examining consultants over the opinions of a treating physician. While this Court has often criticized ALJ's for giving greater weight to non-examining consulting physicians over the opinions of examining and treating physicians, that criticism generally relates to the consulting physician's failure to obtain or refer to much of the record; the consulting physician's attempts to make credibility determinations, though they have never met the patient; or the consulting physician's blatant disregard of the medical opinions of treating or examining physicians who are in a better position to judge the Plaintiff's impairments.

However, after a thorough review of the record, this Court cannot state that the ALJ improperly weighed the medical evidence. There simply are no opinions from Plaintiff's examining or treating physicians which sufficiently contradict the opinions of the consulting physicians. Notes from Plaintiff's treating physicians clearly indicate he suffered from chronic ear infections since boyhood and, prior to his

claimed onset of disability, began to have complications related to chronic bronchitis.  The consulting physicians did not deny this and appeared to account for these conditions when assigning Plaintiff functional limitations.  Between Plaintiff's claimed onset of disability and his date last insured, Plaintiff only went to the doctor once, and so there is very little indication of the Plaintiff's condition during the relevant time period.  In addition, though Dr. Creti, in May of 2002, implied Plaintiff should have previously been awarded disability, he failed to discuss any of Plaintiff's limitations.  Furthermore, in August of 2003, Dr. Thedinger indicated Plaintiff "should not work above ground level or in a position where there is a great deal of head movement" but did not indicate any other limitations.  The ALJ explicitly included these limitations in his hypothetical to the VE, and the VE stated Plaintiff was still capable of a significant amount of work in the national economy.

Dr. Weiss' physical RFC assessment, because it was not completed until Plaintiff filed for disability in 2007, is based on all of the relevant medical evidence.  In addition, there is nothing inconsistent or unusual about Dr. Weiss'

comments related to Plaintiff's medical history; and this Court has no reason to doubt the veracity of his conclusions.

Plaintiff's Brief notes the ALJ, because it was not then available, failed to consider a letter from Dr. Thedinger dated February 19, 2010. However, Dr. Thedinger's 2010 letter appears to refer to Plaintiff's conditions as of 2010 and does not discuss Plaintiff's condition in 2004. Notably, Dr. Thedinger's letter from 2003, which is more relevant to the ALJ's determination, indicates Plaintiff's conditions were then less severe.[11]

---

[11] The body of the 2010 letter states in full:

> I am writing on behalf of my patient, Phillip Huisinga, who suffers from bilateral active chronic otitis media. This has caused a significant loss of hearing. He has a moderate to profound hearing loss on the right and a mild to profound loss on the left. Also, this chronic infection causes him to have a significant sense of imbalance and unsteadiness. Because of these symptoms, I have asked him not to work in his current profession as a carpenter. Because of the chronic otitis media, he is unable to wear appropriate hearing aids. Thus, he has marked limitations in his ability to hear and communicate. Tr. 331.

### D. Plaintiff's Subjective Allegations

As previously noted, Plaintiff contends the ALJ failed to properly consider his and his wife's lay opinions. In crafting an RFC, the regulations explicitly require an ALJ to not only weigh the medical evidence but also consider lay observations of a Plaintiff's limitations, including limitations attributable to a Plaintiff's subjective accounts of pain or other symptoms. 20 C.F.R. § 404.1545(a)(3). Based on the general substantial evidence on the record as a whole standard of review, a District Court should defer to an ALJ's determination that a plaintiff's allegations lack credibility "as long as the ALJ explicitly discredits a [plaintiff's] testimony and gives a good reason for doing so." Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (quoting Schultz v. Astrue, 479 F.3d 979, 983 (8th Cir. 2007)).

In Polaski v. Heckler the Eighth Circuit held that an ALJ must not dismiss a Plaintiff's subjective allegations based solely on a lack of objective evidence. 739 F.2d 1320, 1322 (8th Cir. 1984). An ALJ must consider all evidence, including a plaintiff's work record, statements from physicians, and statements from third parties relating to the following:

> 1) the [plaintiff's] daily activities;
> 2) the duration, frequency and intensity of
> the pain;
> 3) precipitating and aggravating factors;
> 4) dosage, effectiveness and side effects
> of medication; [and]
> 5) functional restrictions.

Polaski, 739 F.2d 1320, 1322 (8th Cir. 1984).

As previously noted, both Plaintiff's wife, Mrs. Huisinga, and Plaintiff have filed Function Reports with the SSA; and Plaintiff testified to his physical limitations at the administrative hearing. Specifically, Plaintiff testified his ear infections lasted anywhere from 2 to 8 months. He also reported a recurrent buzzing in his ears that would render him completely immobile for 3 days at a time and dizzy spells when he bent over or went in and out of buildings due to changes in pressure. When the ALJ asked Plaintiff why he stopped steady employment in the 1990's, Plaintiff responded, "when I get ear infections I can't work for a long period . . . ." Tr. 43. When the ALJ asked Plaintiff whether he had worked full time prior to or around the time period relevant to a determination of disability, Plaintiff stated he generally only worked summer months and would not be able to work when he got an ear infection. Tr. 44. However,

Plaintiff did not specifically indicate his infection status during the relevant time period in 2004. Plaintiff also testified that, on some occasions, his ear infections would cause him to miss "work for two or three months at a time." Id. When the ALJ asked the Vocational Expert (VE) whether, if Plaintiff's testimony were given full credibility, Plaintiff could perform full time work available in the national economy, the VE testified that if Plaintiff's testimony were fully credible, he could not. Tr. 57.

This Court has at times criticized an ALJ's reasons for discrediting a lay person's opinion. In this case, the ALJ adopted Plaintiff's RFC predominantly from the functional limitations espoused by the consulting physicians, as well as the other limitations espoused by Plaintiff's treating physicians but did not incorporate any of Plaintiff's subjective allegations or his wife's observations of his limitations. In this Court's experience, it is common for ALJ's to treat credibility[12] as though it is a zero sum game, and, more often than not, the plaintiff loses that game. Of

---

[12] Credibility, though related, is separate from honesty. Individuals are often being honest though their rendition of facts is, objectively speaking, inaccurate.

course, people are generally neither completely believable nor completely unbelievable; there are, in reality, shades of gray.

In his decision, the ALJ determined that though Plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms . . . the [Plaintiff's] statements concerning the intensity, persistence, and limiting effects of" those symptoms were "not credible to the extent they [were] inconsistent with" the assigned RFC. Tr. 23. The ALJ then discredited Plaintiff's subjective allegations on the following bases: (1) Plaintiff worked as a carpenter until May of 2004; (2) Plaintiff's daily activities were inconsistent with disability; (3) Plaintiff's statement that he required antibiotics for his ear infections for up to 8 months at a time was not supported by the record; and (4) Plaintiff's subjective allegations were contrary to the weight of the evidence. Tr. 25.

As to the ALJ's first justification, both at the administrative hearing and in Plaintiff's Work History Report, Plaintiff consistently admitted that he worked on a part-time basis as a handyman for a Mr. Jerry Swarthy until around May

of 2004.  Tr. 50 and 157.  However, at the administrative hearing, Plaintiff made it clear that he often could not work because of his impairments, and there is no information on record to the contrary; as such, it is difficult to understand how his statements undermine his credibility as to whether or not he could work on a full time basis.

As to the ALJ's second justification, the record indicates Plaintiff "spends his time watching television and playing video games" and is "able to do light housework, such as laundry and dishwashing, care for his personal needs, prepare meals, go grocery shopping . . . and spend time with others."  Tr. 24.  Apparently, the ALJ believes these activities are consistent with full-time employment.  However, the Eighth Circuit has "'repeatedly stated that a person's ability to engage in personal activities such as cooking, cleaning or a hobby does not constitute substantial evidence that he or she has the functional capacity'" to engage in full time work.  Boettcher v. Astrue, 652 F.3d 860, 866 (8th Cir. 2011) (quoting Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007)).  "'[I]t is well settled law that a claimant need not prove [he] is bedridden or completely helpless to be found

disabled.'" <u>Id.</u> (quoting <u>Reed v. Barnhart</u>, 399 F.3d 917, 923 (8th Cir. 2005)).

As to the ALJ's third justification, the ALJ seems to be referring to Plaintiff's testimony elicited by Plaintiff's attorney at the administrative hearing. Though the ALJ does not cite to the transcript, the following exchange appears to be what the ALJ was referring to:

> Q: And these ear infections, they would last?
>
> A: The ear infections would last anywhere between two months to eight months.
>
> Q: Okay. And that with treatment for – with antibiotics or what –
>
> A: Right

Tr. 51.

This Court is not persuaded Plaintiff was testifying that he was on antibiotics for 2 to 8 months at a time; rather, his testimony seems to be indicating that he was sick for 2 to 8 months at a time, despite at least some antibiotic treatment. In any event, this brief exchange cannot reasonably undermine Plaintiff's credibility. The record is clear that Plaintiff

has chronic ear infections and bronchitis and was often prescribed antibiotics therefore.[13]

As to the ALJ's fourth justification, the Plaintiff's subjective allegations do appear to be contradicted by other evidence of record; specifically, and as outlined in the section above, the medical evidence simply does not support a finding of disability as of September of 2004. Again, Dr. Thedinger's 2003 letter implies Plaintiff could find some work in the national economy, despite his limitations. In addition, in a letter, dated September 11, 2006, Plaintiff indicated he wanted to return to his previous medication because within "two weeks" of using his previous medication, his infections were "gone." Tr. 227. Furthermore, at only one time during Plaintiff's claimed period of disability did Plaintiff seek out medication or treatment. See Davis v. Apfel, 239 F.3d 962, 967 (8th Cir. 2001) (stating that an ALJ may properly take into account evidence indicating that a Plaintiff did not seek medical treatment or take medication).

---

[13] Plaintiff was prescribed antibiotics on September 15, 2000; April 4, 2001; August 19, 2002; July 14, 2003; August 8, 2003; and September 21, 2004. Tr. 222, 224, 230, 236, 237, and 243.

Finally, on January 20, 2005, Dr. Creti indicated that though Plaintiff gets chronic infections, he has been able to control them "for many years with ear drops."  Tr. 244; <u>see</u> <u>Goff v. Barnhart</u>, 421 F.3d 785, 789 (8th Cir. 2005) ("An impairment which can be controlled by treatment or medication is not considered disabling.")

In relation to Mrs. Huisinga's lay opinion, the ALJ discredited her on the following bases:  (1) Plaintiff's daily activities were inconsistent with disability; (2) her Third Party Function Report neglected to mention that Plaintiff was repairing mobile homes for pay at the time she filled it out; and (3) her opinion was contrary to the weight of the evidence.  Tr. 24.

As to the ALJ's first justification, this Court has already indicated Plaintiff's daily activities were not inconsistent with Plaintiff's allegations.  This applies equally to Mrs. Huisinga's observations.

As to the ALJ's second justification, it is true that Mrs. Huisinga did not mention Plaintiff was doing maintenance work at the time she filled out her Third Party Function Report, but that is because she filled out the Report in 2007,

and the record indicates Plaintiff last worked as a maintenance man in 2004.

As to the ALJ's third justification, this Court has already indicated that the medical records, as well as a letter Plaintiff wrote to Dr. Thedinger, simply do not support, and are, to some extent, inconsistent with Plaintiff's allegations. This conclusion applies equally to Mrs. Huisinga's observations.

Additionally, though the ALJ did not explicitly mention this, it is difficult to know whether Plaintiff's subjective accounts of his limitations and Mrs. Huisinga's observations of his limitations are referencing Plaintiff's condition in 2004 or Plaintiff's condition at a later date. The administrative hearing took place in 2009, more than 5 years after Plaintiff's date last insured; and the Third Party Function reports were filled out in 2007, 3 years after Plaintiff's date last insured. Notably, both Plaintiff and Mrs. Huisinga repeatedly refer to Plaintiff's back and leg conditions, but there is absolutely no indication Plaintiff ever visited a doctor in relation thereto during or prior to the relevant time period in 2004.

Overall, the ALJ's decision not to incorporate layperson evidence into the RFC he assigned Plaintiff was, to some extent, unreasonable. For instance, the record clearly indicates Plaintiff's conditions rendered him incapable of working for at least a short period of time on at least a yearly basis, and absenteeism went unmentioned in the RFC the ALJ assigned Plaintiff. The record also clearly indicates Plaintiff suffers from pulmonary disorders and associated shortness of breath which no doubt effected his pace. As this Court has repeatedly noted, RFC is "not the ability merely to lift weights occasionally in a doctor's office . . . it is the ability to perform the requisite physical acts . . . in the real world." Malloy v. Astrue, 604 F. Supp. 2d at 1250 (quoting 683 F.2d at 1147).

However, "'an arguable deficiency in opinion-writing technique' does not require'" a court "'to set aside an administrative finding . . . .'" Hepp v. Astrue, 511 F.3d 798, 806 (8th Cir. 2008) (quoting Robinson v. Sullivan, 956 F.2d 836, 841 (8th Cir. 1992)) (internal quotations omitted). When the medical records and Plaintiff's own statement in his 2006 letter to Dr. Thedinger are taken into consideration, it is

reasonable to infer that the frequency and duration of Plaintiff's flare-ups, as well as his day-to-day functional capacity, were inconsistent with a finding of disability as of his date last insured. Thus, the ALJ's final determination, despite flaws in the means employed at arriving at it, was based on substantial evidence on the record as a whole.

## IV. CONCLUSION

Though it may be argued a person should be able to collect disability at any time he or she becomes disabled, this is not our current system. Under our current system, an individual must earn enough work credits in order to be eligible for disability, and Plaintiff was last eligible in September of 2004. It is clear Plaintiff, prior to his date last insured, suffered from recurrent ear infections, resulting in significant limitations. It is also clear that, prior to his date last insured, Plaintiff started to develop respiratory disease, resulting in significant limitations. It is also clear that Plaintiff's conditions are chronic and have, since his date last insured, grown increasingly worse, resulting in increasingly debilitating limitations. Finally, it also clear that since Plaintiff's date last insured, he has

developed new conditions with new, corresponding limitations. However, while this Court sympathizes with Mr. Huisinga's situation, the ALJ's final decision was supported by substantial evidence on the record as a whole. **Therefore, the ALJ's decision is hereby affirmed.**

    **IT IS SO ORDERED** this 25th day of September, 2012.

_____
Donald E. O'Brien, Senior Judge
United States District Court
Northern District of Iowa